Harlington Wood, Jr., Circuit Judge, dissented and filed opinion.

**RIVER ROAD ALLIANCE, INC., et al.,**
**Plaintiffs-Appellees,**

v.

**CORPS OF ENGINEERS OF UNITED STATES ARMY, et al.,**
**Defendants-Appellants,**

**National Marine Service Inc.,**
**Defendant-Intervenor-Appellant.**

**Nos. 84–1689, 84–2045.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1985.

Decided May 17, 1985.

Rehearings and Rehearings En Banc
Denied Aug. 8, 1985.

Lewis C. Green, Green, Hennings & Henry, St. Louis, Mo., James L. Morgan, Asst. Atty. Gen., Environmental Control Div., Springfield, Ill., for plaintiffs-appellees.

Ellen J. Durkee, Dept. of Justice, Lands Div., Washington, D.C., Andrew Rothschild, Lewis & Rice, St. Louis, Mo., for defendants-appellants.

Before WOOD, ESCHBACH and POSNER, Circuit Judges.

POSNER, Circuit Judge.

We must decide whether, as the district court held, the Army Corps of Engineers violated section 102 of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332, by granting a permit to National Marine Service Inc. for a temporary barge fleeting facility on the Mississippi River without having adequately considered the environmental consequences.

In 1980 National Marine Service (actually its predecessor, but we shall simplify the facts to shorten our opinion) applied to the Corps of Engineers for a permit under section 10 of the River and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, for a barge fleeting facility on the Illinois bank of the Mississippi, just below the town of Grafton. A fleeting facility is a maritime parking lot—a place where barges are either anchored or moored to buoys while waiting to be towed. The facility was to have a capacity of 30 barges and to occupy 1,500 feet (and cover an area of five acres of water) of a seven-mile scenic stretch along what is called "Alton Lake" or "Alton Pool," but is actually a part of the Mississippi River. The State of Illinois, an appellee, acknowledges that Alton Lake "undergoes heavy barge traffic"; as many as 300 barges pass through it in a day. But the shores of the scenic portion are free from commercial development, except that National Marine Service has a shipyard, with until recently a fleeting facility attached, a half mile north of the proposed site. National Marine Service had leased that fleeting facility from the Illinois Department of Transportation, which cancelled the lease during this lawsuit.

The Illinois shore of Alton Lake is surmounted by dramatic bluffs; the Missouri shore is farm land. A scenic highway, the Great River Road, runs along the Illinois shore beneath the bluffs, and motorists have a view of Alton Lake and the Missouri shore beyond as well as of the bluffs to their east. (See Figure 1 at end of opinion.) National Marine Service's desire for the proposed fleeting facility was due in part to congestion at one of the locks of the Mississippi River. The lock is to be replaced (originally this was to be in 1987, but the current estimate is 1988), and the facility discontinued when that happens.

After holding a public hearing on the environmental impact of the proposed facility, the Corps of Engineers issued an "environmental assessment" which concluded that the facility would have no significant environmental impact. Concerning the facility's aesthetic impact, the Corps, while acknowledging that "bluff and river areas at and downstream of applicant's worksite clearly provide some of the most impressive and unique vistas of any area along the Mississippi River" and that "in the opinion of some individuals, the presence of [National Marine]'s proposed fleeting facility, or any similar intrusion into the natural setting, would be aesthetically objectionable," noted that "other individuals welcome the opportunity afforded by the Great River Road for a closeup view of towboats and barges. In addition to the static visual effect of moored barge fleets, a fleeting operation also presents a view of normal activities on the waterway as small push boats work to move barges in and out of fleets during the disassembly and assembly of large tows. In any event, the aesthetic impairment, or enhancement, should be minimal since [National Marine]'s fleet will be limited to the length of six barges. If a motorist were proceeding along Great River road at a rate of 40 miles per hour, a

fleet six barges long would obstruct his view of the river for less than 25 seconds."

Among other issues addressed in the environmental assessment was the possible impact of the proposed fleeting facility on a very large mussel bed downstream. There was concern that while the barges were being towed into and out of the facility, and assembled into tows or disassembled, the propellers of the tug boats would stir up silt on the river bottom, and this silt would drift down onto the mussels and smother them. The environmental assessment (as fleshed out by later documents prepared by the Corps) noted that none of the mussels were members of any endangered species, but it directed that the mussel beds be inspected again after the facility had been in operation for two years. Later in the administrative process, concern was expressed that the facility might hurt wintering catfish. There was also concern that no fishing of any kind would be possible along the stretch of shoreline that the facility would occupy, and that boating and other sports might also be harmed. The Corps did not think any of these consequences would be serious, nor that two historic towns, respectively 1.5 and 4.0 miles downstream from and out of sight of the facility, would be harmed.

The National Environmental Policy Act requires a federal agency to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). Since the Corps found that the proposed barge fleeting facility would have no significant effect on the environment, it did not think it had to prepare the detailed environmental impact statement envisaged by section 4332(2)(C)(i); and if its premise was correct, so was its conclusion. See 40 C.F.R. §§ 1501.4(e), 1508.13 (regulations of Council on Environmental Quality). Since the proposed facility met the Corps' own cost-benefit criteria, see 33 C.F.R. § 320.4(a)(1), the Corps issued a permit for the facility,

to expire however when the lock is replaced.

The facility went into operation in 1982. It operated at 30–40 percent capacity (9 to 12 barges) during the summer, the peak tourist season. A neighborhood group, and later the State of Illinois, brought this suit to enjoin it; the injunction was granted; and in 1984 the facility was shut down pending the outcome of this appeal. In granting the injunction the district judge issued an opinion that the plaintiffs had prepared for his signature. The main conclusion in the opinion is that the Corps of Engineers did not take a careful enough look at the environmental impact of the fleeting facility. The usual consequence of such a decision is an order to prepare an environmental impact statement. Although the district judge did not order the Corps to do so, and indeed expressly declined to decide whether the Corps had to do so, we find it hard to see how the Corps could have met his objections to the adequacy of its environmental assessment without doing so. The parties indicate implicit agreement with this point by relying for the most part on cases in which the question was whether an environmental impact statement had to be filed. We can therefore promote clarity by recasting the main issue on appeal as whether the Corps should have prepared an environmental impact statement. If we are right that the Corps did not violate section 102's requirement of such a statement for all major federal actions having a significant environmental impact, or the section's separate requirement of consideration of alternatives to the proposed action, the plaintiffs' reservations about the adequacy of the environmental assessment and of related documents that the Corps did prepare would not warrant our upholding the district court's decision and returning the case to the Corps to prepare a somewhat more elaborate environmental assessment that would still fall short of being a full-fledged environmental impact statement.

Although the statute does not indicate how lengthy or detailed an environmental

impact statement must be, and the required length and detail will of course vary with the nature of the proposed action whose impact is being studied, the implementing regulations require a formidable document. It will often be multi-volume and cost the government and the private applicant (if there is one, as there is here) hundreds of thousands of dollars to prepare; $250,000 is the estimate in this case. See 33 C.F.R. § 230.11; 33 C.F.R. Part 230, App. B, ¶¶ 3, 10–11. An environmental impact statement consisting of 858 pages plus two appendix volumes is mentioned in National Environmental Policy Act Oversight, Hearings Before Subcomm. on Fisheries, Etc., of H. Comm. on Merchant Marine and Fisheries, 94th Cong., 1st Sess., ser. 94–14, at 172 (G.P.O.1975). If such a statement were required for every proposed federal action that might affect the environment, federal governmental activity and the private activity dependent on it would pretty much grind to a halt. The Corps of Engineers alone receives more than 14,000 permit applications a year. Applying for a routine permit would often be economically infeasible if an environmental impact statement were always required. So it is no surprise that the statute does not require such a statement for every federal action having some environmental impact. The action must be "major," and the impact "significant." The Corps filed only 119 environmental impact statements in 1983. Council on Environmental Quality, Environmental Quality 1983, at 333 (1983) (tab. A–81).

The purpose of an environmental assessment is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement. See also 33 C.F.R. § 230.10. The environmental assessment is a brief document, see 40 C.F.R. § 1508.9, which under the Corps of Engineers' regulations is normally not to exceed 15 pages, see 33 C.F.R. § 230.9, and which here was only 4 pages long but was supplemented by 17 pages of additional findings. The statutory concept of "significant" impact has no

determinate meaning, and to interpret it sensibly in particular cases requires a comparison that is also a prediction: whether the time and expense of preparing an environmental impact statement are commensurate with the likely benefits from a more searching evaluation than an environmental assessment provides. The nature of the required judgment explains why we have held that an agency's decision not to prepare an environmental impact statement will be set aside only if it is an abuse of discretion. E.g., *Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir.1984).

Although other courts have adopted what they conceive to be the higher standard of "reasonableness," *id.* at 417 n. 5; *Township of Lower Alloways Creek v. Public Service Elec. & Gas Co.*, 687 F.2d 732, 742 (3d Cir.1982), we are not sure how much if any practical difference there is between "abuse of discretion" and "unreasonable." Courts dissatisfied with the "abuse of discretion" formulation are concerned that an agency whose primary mission is not the protection of the environment—an agency such as the Corps of Engineers—may tend to slight environmental concerns in deciding whether to encumber its decision-making process with an environmental impact statement. See the criticisms of the Corps in *Sierra Club v. Corps of Engineers*, 701 F.2d 1011, 1032–33 (2d Cir.1983); *Sierra Club v. Sigler*, 695 F.2d 957, 962–63 n. 3 (5th Cir.1983), and *Manatee County v. Gorsuch*, 554 F.Supp. 778, 783–96 (M.D.Fla.1982)—but for a far more favorable view of the Corps see Andrews, *Agency Responses to NEPA: A Comparison and Implications*, 16 Natural Resources J. 301, 318 (1976). Such a tendency is bound to make the courts more alert for abuses of discretion than they might otherwise be. But realism about the danger of abuse does not require a change in the standard of judicial review. There is plenary review and there is deferential review, and whether it is fruitful to attempt fine gradations within the second category may be doubted, though there is no need to resolve our doubt here.

However the standard of review is worded, it is clear that the issue for us is not whether National Marine Service's barge fleeting facility was (and will again be, if we reverse) an unfortunate eyesore, marring one of the few remaining spots of essentially unspoiled natural beauty on the Mississippi River in the general vicinity of St. Louis; undoubtedly it is that (see Figure 2 at end of opinion). It is not whether we, if we were the Army Corps of Engineers, would have denied the permit. It is whether the Corps exceeded the bounds of its decision-making authority in concluding that the fleeting facility would not have so significant an impact on the environment as to require a more elaborate study of environmental consequences.

In so stating the issue, we assume either that the Corps' action in granting the permit was "major" or that "major" adds nothing to "significant." Although the criteria have been treated as distinct in this circuit, see, e.g., *Assure Competitive Transportation, Inc. v. United States*, 635 F.2d 1301, 1308–09 (7th Cir.1980), no court has embraced the peculiar suggestion (rejected in *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1321–22 (8th Cir.1974) (en banc)) that an action that might have a grievous impact on the environment would not require the preparation of an environmental impact statement if the action was in some sense minor. Indeed, the "minor" action (implying few benefits) that may cause major environmental harms is a prime candidate for requiring such a statement; if the cost of preparing such a statement deters the action, there is little lost, and much gained. It seems best not to speculate further on the meaning of "major," but to assume that the Corps' action in authorizing the fleeting facility was major and to move directly to the issue of significant impact.

Here we can get little help either from administrative regulations (such as 40 C.F.R. § 1508.27, the ambitious but nondirective effort of the Council on Environmental Quality to define "significant" impact) or from precedent. So varied are the federal actions that affect the environment—so varied are the environmental effects of those actions—that the decided cases compose a distinctly disordered array, as shown by Professor Rodgers' illuminating comparison of cases in which environmental impact statements were, and were not, held to be required. See Handbook on Environmental Law 756–61 (1977). There we read for example that an environmental impact statement is required for a government loan to build a golf course and park but not for a mock amphibious assault by a battalion of marines on a state park, or for a train shipment of nerve gas, or for certain exploratory mining operations. See *id.* at 758, 760–61.

Although the heterogeneity of the cases makes generalization difficult, we find some evidence in the recent cases of a loosening of the judicial reins on agency decisions not to require environmental impact statements. See, e.g., *City of Aurora v. Hunt*, 749 F.2d 1457, 1468 (10th Cir. 1984) (new approach procedure for Denver airport); *City of New York v. Department of Transportation*, 715 F.2d 732, 741–52 (2d Cir.1983) (regulations for transporting large quantities of radioactive materials by highway); *Township of Lower Alloways Creek v. Public Service Elec. & Gas Co.*, *supra*, 687 F.2d at 746–49 (expansion of a pool for storing spent fuel from nuclear reactor). Judge Friendly's interesting suggestion, made in dissent in 1972, that the meaning of "significant" be fixed at the lower end of the spectrum that runs from "not trivial" to "momentous," *Hanly v. Kleindienst*, 471 F.2d 823, 837, 839 (2d Cir.1972) (dissenting opinion)—an approach never followed in this circuit, see, e.g., *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 231–32 (7th Cir.1975); *First National Bank of Chicago v. Richardson*, 484 F.2d 1369 (7th Cir.1973)—was the product of a time when environmental impact statements were less formidable than they have grown to be, when federal agencies were less sensitive than they mostly are today to environmental concerns, and, perhaps most important, when environmental assessments involved a less

elaborate procedure for determining whether there was so significant an environmental impact as to warrant the preparation of an environmental impact statement. One of the things Judge Friendly was complaining about was his brethren's stepping up the requirements for such assessments, see 471 F.2d at 836; today, for good or ill, environmental assessments are thorough enough to permit a higher threshold for requiring environmental impact statements. We note in this connection that the number of environmental impact statements filed by all federal agencies fell by 50 percent between 1978 and 1983. See Council on Environmental Quality, *supra,* at 333 (tab. A–81). And finally there is growing awareness that routinely requiring such statements would use up resources better spent in careful study of actions likely to harm the environment substantially. See *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir. 1982).

■ Turning at last to the facts of this case, we note first that the Corps has the advantage over us of having heard live testimony from neighbors of the proposed facility and of being able to gauge the intensity as well as sincerity of the opinions expressed. An agency is not required to hold a public hearing before preparing an environmental assessment, see 40 C.F.R. § 1506.6(c), but if it does its decision is entitled to greater weight. The Corps also winnowed through hundreds of written submissions, which it could evaluate in light of the oral statements, as we cannot. The Corps also has a fund of knowledge and experience regarding the Mississippi River that judges of a federal court of appeals cannot match. Although the plaintiffs make fun of the Corps' remark that some people would enjoy a chance to see barges from close up, some people did testify that they would enjoy this, and we cannot say that the Corps was unreasonable in believing them and in giving some weight to their tastes, however unrefined those tastes may seem to people who prefer natural to commercial vistas. And even if that testimony is wholly disregarded, it is still

the case that whether a 1,500 foot line of barges, though undoubtedly an eyesore in a place of natural beauty, represents so significant a degradation of the environment as to require the Corps to prepare an environmental impact statement is a sufficiently close question to prevent us from substituting our judgment for the Corps'.

■ The Mississippi is not a wilderness area. There is heavy barge traffic, and National Marine's shipyard half a mile above the proposed facility. The facility will not be a shipyard, a dry dock, or a glue factory, but an aquatic parking lot—there will be little noise and little emission of fumes. It will be temporary, and will be removed without leaving any damage to the scenic properties of the area. Cf. *City & County of San Francisco v. United States,* 615 F.2d 498, 503 (9th Cir.1980). The closest residence is three-fifths of a mile from the site. Considering all these facts we cannot say that the aesthetic impact of the facility alone was such that the Corps was unreasonable to regard the impact as insignificant. Aesthetic objections alone will rarely compel the preparation of an environmental impact statement. Aesthetic values do not lend themselves to measurement or elaborate analysis. See *Maryland-National Capital Park & Planning Comm'n v. U.S. Postal Service,* 487 F.2d 1029, 1038–39 (D.C.Cir.1973). The necessary judgments are inherently subjective and normally can be made as reliably on the basis of an environmental assessment as on the basis of a much lengthier and costlier environmental impact statement. The fact that there was public opposition to the fleeting facility cannot tip the balance. See, e.g., *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983). That would be the environmental counterpart to the "heckler's veto" of First Amendment law.

■ There is more to this case than aesthetics, but the other environmental effects are trivial indeed. There are no marinas or launch ramps for small boats in the vicinity of the proposed facility, and as the

river is very wide at this point (almost a half mile) there is no danger of obstructing small (or for that matter large) boats. The loss of 1,500 feet of the shoreline to fishermen is unimportant since there is plenty of room elsewhere along the shoreline for fishing. There is no beach. The visual impact of the moored barges on joggers using a path along the Great River Road hardly deserves mention. Nor was the Corps required to give weight to the harm to the mussels—affecting as is the tale of how they will be smothered by the silt stirred up by the propellers. These mussels are not an endangered species, or even a sport fish. They live in beds owned by private persons who can do with the mussels what they want, including selling them for catfood or making buttons out of their shells or for that matter burying them in silt. Should it turn out that the barge fleeting facility kills any mussels—though there is no suggestion that this happened during the 18 months that the facility was in operation before the district court enjoined it—National Marine Service will be liable in damages in an action for nuisance brought by owners of the mussel bed.

The catfish provide a more difficult question because people fish for them; unlike the mussels in their beds, the catfish are not owned by anybody until they are caught. Although the fleeting facility will discourage catfish from scavenging beneath the barges, the fraction of Alton Lake occupied by the facility when it is full up with barges—five acres out of thousands—is minute; there is no reason to believe that catfish are significantly affected by so small a reduction in their stamping grounds. And catfish, of course, are not an endangered species; indeed, they are farmed extensively. Although the Fish and Wildlife Service opposed the fleeting facility, the Corps of Engineers was just required to hear the Service out, as it did— not to agree with it.

The plaintiffs also complain that the Corps failed to consider the cumulative effects of having many fleeting facilities in the general area of the one proposed by National Marine Service. Since any subse-

quent applicant for such a facility will have to get a Corps of Engineers permit too, the Corps will be able to prevent the problem from getting out of hand. The concern with cumulative effects seems anyway pretty academic since by the time any proposal for another fleeting facility in Alton Lake is processed, National Marine Service's temporary permit will have expired. In considering whether to renew it (should renewal be sought), the Corps will of course be required to consider any other proposal for a fleeting facility that is then pending before it. There were some other applications for permits for fleeting facilities pending at the time the Corps approved National Marine Service's, but they were either geographically remote from National Marine's site, or have been withdrawn, or both.

The plaintiffs' final complaint that we need consider (the others are insubstantial) is that the Corps of Engineers failed to explore alternative sites for the facility. Section 102(2)(E) of the National Environmental Protection Act requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 40 U.S.C. § 4332(2)(E). This requirement is independent of the question of environmental impact statements, and operative even if the agency finds no significant environmental impact. E.g., *Nucleus of Chicago Homeowners Ass'n v. Lynn, supra,* 524 F.2d at 232. For nonsignificant impact does not equal no impact; so if an even less harmful alternative is feasible, it ought to be considered. But the smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct. *City of New York v. Department of Transportation, supra,* 715 F.2d at 744. National Marine Service had made a study of alternative sites and found none suitable. The Corps was entitled not to conduct a further study of alternatives unless the plaintiffs were prepared to shoulder the burden of showing that National

Marine had overlooked some plausible alternative site—and they were not. The Corps is not a business consulting firm. It is in no position to conduct a feasibility study of alternative sites on the Mississippi for a barge fleeting facility, a study that would have to both evaluate National Marine Service's business needs and determine the availability of the necessary permissions from the owners of riparian land at the various sites. The Corps has to depend on the parties for such information, and National Marine Service's submission was unrebutted.

The judgment of the district court is reversed with directions to vacate its injunction and dismiss the suit.

Fig. 1

Fig. 2

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

Some of the enjoyment that thousands of people derive from this unique scenic area on a small bit of the Illinois shore of the Mississippi River is being sacrificed and the area damaged without sufficient justification for the financial benefit of a private commercial company.

Judge Beatty, the trial judge, knows this territory. He does not need to rely on a stagnant record and pictures to appreciate the diverse and adverse impact which will result from this commercial intrusion into this living park-like area. We should not therefore, in keeping with the spirit of *Anderson v. City of Bessmer, North Carolina,* —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), so lightly toss his findings over the side. We should begin with them even if, as the majority says, they were prepared for him. Judge Beatty found that "the Corps has failed to take the 'hard look' required to support its conclusions, and has failed to document that 'hard look' in the Environmental Assessment, Findings of Fact and Finding of No Significant Impact, in violation of 42 U.S.C.

Sec. 4332(2)(C) [NEPA] and the applicable regulations." Specifically, Judge Beatty held that the Corps' Finding of No Significant Impact was arbitrary and capricious because: the Corps inadequately considered the fleeting facility's impact on aesthetic values and recreational activities; the Corps excluded from consideration the cumulative impact of existing and foreseeable barge fleeting operations on Alton Lake; the Corps did not take a "hard look" at the facility's potential impact on the mussel bed and over-wintering catfish and did not give adequate weight to the views of the U.S. Fish and Wildlife Service and Illinois Department of Conservation; and the Corps inadequately evaluated the degree to which the fleeting operation's effects on the quality of the human environment are likely to be highly controversial, as required by 40 C.F.R. § 1508.27(b)(4). In addition, the court held that the Corps, and I believe this to be particularly significant in this case, violated section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), and implementing regulations by failing to "study, develop, and describe appropriate alternatives."

The majority opinion pays little heed to Judge Beatty's findings preferring to recast the issue and then to proceed with its own de novo consideration of the problems. The majority's newly framed issue is "whether the Corps should have prepared an environmental impact statement." Judge Beatty did not need to reach that question. He found only that the required initial step, the preparation of the Environmental Assessment, was inadequate to base the finding of No Significant Impact. The Corps, he found, did not take the "hard look" at the environmental consequences required by *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The majority, in response to its recast issue, raises the spectre of the Corps being required to produce, as in some other case, an environmental impact statement, possibly of 858 pages, and separate appendices requiring an expenditure of thousands of dollars. This, it says, would be economically unfeasible for a routine permit, 14,000 of which the Corps receives in a year. There is no need, however, for economic alarm as that is not this case.

The Corps produced an Environmental Assessment about the length of this opinion. Judge Beatty found, apart from the brevity of the Assessment, that the Corps only went through the motions. The Corps' soft, not hard, look may have been considered sufficient since the commercial intrusion was to be only temporary. Like many projects, however, it is less temporary now than it was originally. The latest forecast we have is that the time for completion of the new lock, to which this commercial intrusion is tied, has now been extended to 1988. This commercial permit supposedly would expire at that time.

I differ with the majority not only on what the issue on appeal is, but also with its view of the various environmental elements. I come to a conclusion generally

supporting Judge Beatty's findings, a few of which will be commented on briefly.

### A. Aesthetics.

To the Corps a thing of real beauty and professional enjoyment will be the new lock when it is completed, not the bluffs and river. That can be excused since the Corps, after all, is made up of professional and talented engineers, not artists, nature lovers, catfish fishermen, bikers, hikers, symphony directors, picnickers, joggers, local residents, students, or tourists driving peacefully along the Great River Road.

The Great River Road along the Mississippi River bank was created by Congress in 1973 to provide the public with access to the river's scenic views and recreational activities. The State of Illinois cooperated by acquiring scenic easements, including a scenic easement adjacent to this particular proposed commercial site.[1] That particular scenic easement and others nearby will now be good for an unobstructed view of barges, about the most uninteresting things afloat, not nearly as interesting to many as a piece of floating driftwood. For any barge enthusiasts there may be, as has been suggested, the heavy barge traffic and extensive commercial barge operations elsewhere along the river shore should provide more than ample barge-viewing opportunities. There is some concern that the Mighty Mississippi River will become in time the Mighty Mississippi Barge Canal. I doubt that the Museum of Science and Industry in Chicago would care to have one of the barges on display, even temporarily.

The majority measures the visual obstruction and impact of this commercial permit area only by the length of six barges in a row which a motorist going 40 mph would pass in 25 seconds. Some motorists, I think, would drive faster than that just to get past the barges. You can see the barges, tugboats, and related activity, however, on your approach long before you get there as you look up or down the river.

1. To appreciate the many activities this Great River Road Project offers, citizens may write to the Division of Tourism, Department of Commerce and Community Affairs, 227 South College, Springfield, Illinois 62706 for a copy of *Great River Road, Illinois.*

There is also an impact on the two little historical towns of Chautauqua and Elsah, but they are dismissed by the majority since they are between 1.5 and 4.0 miles downstream. Elsah is a charmer, a bit of the 1800's nestled in a little valley on the bank of the Mississippi River.[2] Since 1973 Elsah has been listed in the National Register of Historic Places. Principia College is within walking distance. Fortunately this commercial barge operation will not be at the foot of Elsah's main street, but nevertheless it is in Elsah's and Chautauqua's neighborhood. Neighborhoods have their own character and what harms part of a neighborhood harms it all. It is about the same as rezoning a residential area in order to permit some company to establish a gas station in the middle of it. The adverse impact on the whole neighborhood is greater than the mere width of the gas station lot.

### B. Recreational Activities.

The area's recreational activities are deemed trivial by the majority, but that is not so for others, including that lonely jogger. The sport fisherman is said to be affected by this commercial barge facility for no more than the 1500 feet width of the site. Fishermen well recognize that finding to be at least a fishing error, if not a legal error. The boat and barge traffic coming and going to the facility from all angles stirring up the water and silt and the attendant noise and activity will extend well beyond the site's 1500 feet frontage. The fishermen, at least while they are fishing, are ordinarily a quiet lot for they know that you do not throw rocks in the water to attract fish.

The mooring area is not considered by the majority to be an obstruction to navigation, but the Corps conceded that it is. In any event the commercial barge traffic coming and going in all directions from the main river channel to this five acres of water will be a hazard for amateur boaters.

There are many ways that the enjoyment and use of this area will be affected, but we cannot pursue them all here.

### C. Aquatic Life.

One of the largest mussel beds known to be in the upper Mississippi touches this commercial site. These mussels, according to the majority, at best are good for cat food and buttons. The Attorney General of Illinois, with help from the Illinois Department of Conservation, as can be seen from his brief, however, holds the lowly mussel in higher esteem.

Mussels play several important roles in the riverine ecosystem including serving as a food source for certain birds and several species of fish. Mussels also provide a substrate for supporting numerous organisms such as algae, flatworm, leeches, and other mollusks which in turn serve as a food source. As filter-feeders, mussels reduce the amount of impurities in the water and serve as a valuable scientific tool providing important information regarding the presence of pesticides, heavy metals, and other pollutants in the river. It is uncontroverted that the mussel bed at this site has been productively harvested commercially for many years.

As for the bewhiskered catfish, the majority finds that he will only be minutely affected by being discouraged from scavenging beneath the barges. Not so. The actual concern is that the river bottom underlying and near this site where the tugboats will be approaching and maneuvering may provide potentially irreplaceable overwinter habitat for catfish which they need to survive. The majority apparently is not concerned since catfish, after all, it notes, are also farmed.[3] True, but there is still a

---

2. To understand and appreciate this rare little town, its people, and homes, see *Better Homes and Gardens, Country Homes,* September/October, 1984 which is devoted primarily to Elsah.

3. The Illinois Department of Conservation, Division of Fisheries, Springfield, Illinois 62706, in a publication, *Potential of Catfish Farming in Illi-*

*nois,* by Al Lopinot and Ray Fisher, begins with this background and words of caution:

In recent years, successful catfish farming in Arkansas and Mississippi has aroused considerable interest. Both states are in the heart of the catfish farming belt as is Illinois in the corn belt. The potentials for catfish

substantial catfish harvest in the river. In 1977, for instance, the harvest ranked first monetarily in the upper Mississippi. And, there are still a few people left who enjoy fishing along the bank with a cane pole, worm, and a red striped bobber.[4]

The barge operation is characterized by the majority as a static maritime parking lot with little activity, almost a pastoral scene. It is much more. It will be a mooring site, but there will be activity in assembling tows and their tugboats. Some of these tugboats develop 5,000 horsepower. It has been estimated that a single tow passage can move 2,700 pounds of sediment into nearby marshes and downriver creating turbidity that can last for several hours. Tugboats maneuvering at the site will have a scouring effect on the bottom causing injury to the mussels, fish, and plant life. With continuous turbidity fish and plant life and bottom fauna have little chance of surviving. This is one way things not now on the endangered list can get there.

The special conditions of the Corps' permit itself, intended to assuage environmental concerns, belies the majority's static view of this commercial site. Only "major repairs" are prohibited, so the site may be used for repairs considered less than major, whatever they may be. Work barges, anchor barges, fleet barges, derelicts and sunken vessels cannot be permanently moored at the site. They may be moored there temporarily, however long "temporarily" may be. Another interesting special Corps' condition requires minimization of the use of searchlights and noise from bullhorns and machines at the site, whatever that "minimization" may be. Residents along the river might adopt a little self-help by pulling down their window shades at night to obstruct the powerful searchlights. I have nothing to suggest, however, about how to minimize a bullhorn. That all tells us too that this new commercial area, even at night, will not be quiet and peaceful.

Conclusion.

I have expressed these different views of the environmental situation, not to substitute my judgment for the Corps, but to suggest that these considerations should have been enough to prompt the Corps, at least, to take a genuine "hard look" and to say to the company, "There are too many people and environmental problems in this special River Road area. Let's see if we can't locate a suitable alternative site. Other barge companies have found them so you probably can too somewhere up or down this big river where environmental harm can be minimized. It may be a little less economical or convenient for you, but after all, it is, as you say, only temporary."

Judge Beatty found the Corps did not comply with section 102(2)(E), 42 U.S.C. § 4332(2)(E) which requires the Corps to study, develop, and describe appropriate alternatives.[5] The majority correctly states that this alternative requirement is independent of the question of an environmental impact statement which we have been considering, and is operative even if the agency finds no significant environmental impact. It is also stated by the majority that the company did make a study of alternate sites and found none to its liking. Permitting the company by itself and for itself to find and propose an alternate site

---

farming in Illinois are *very* limited because of the short growing season, lack of economical water supplies, and unexplored markets for the higher priced domestic product.

To enter the catfish farming business requires suitable land for pond construction, an ample supply of water, a market for the fish, and technical know-how. Technical knowledge cannot be overemphasized—too many popular articles neglect this important issue, resulting in bankruptcy for many "rookie" catfish farmers. In addition, the potential farmer will need suitable financial backing and a license from the state in order to sell the fish.

**4.** In the past year friends of mine fishing the tributaries have caught catfish weighing over 30 pounds, which even though it does little to help this case, at least has the makings of good fish stories.

**5.** 33 C.F.R. §§ 209.410(d)(1)(ii) & 230.5(e), 33 C.F.R. App. B, P. 8(a), and 40 C.F.R. §§ 1500.-2(e) & 1501.2(c) also require consideration of alternatives.

less convenient for its pocketbook is a little like consulting the fox about the best location for the chicken house. The district engineer for the Corps, however, agrees that alternate sites could be found, but opted unfortunately to let this commercial enterprise into this "park" for the operational efficiency of the company and reduced fuel consumption.

The majority holds that the Corps, in spite of the statute and regulations, was entitled to accept the company's view of alternate sites. The alternative site burden is unloaded on those citizens or organizations who express environmental concerns. The Corps, the majority says, is not a business consulting firm, and the Corps would have to evaluate the company's business needs. Also the Corps would have to determine whether permission could be secured from owners at the alternate sites. That burden does not and should not lie with the concerned citizens who are now being held in default by the majority for not doing what the Corps and the company should have done. In any event section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), provides that the Corps "shall study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." That was not seriously done and it should have been.

In this case, I would, as Judge Beatty did, leave the question open for the Corps, if it desires, to take the required "hard look." If a new look, but this time a "hard look" is to be taken, I would direct that special emphasis be given to alternative sites because of the unique circumstances of this special area. With a little encouragement from the Corps the company would soon find a suitable substitute area although it would be its second choice. It would, after all, be only temporary, and temporary works both ways, so the economic impact on the company of an extra mile or two should not be devastating. The impact on the company, in any event, would be a great deal less than even the temporary impact of its private commercial activities on the environment and the many citizens who could enjoy this area, a very rare area in this part of the world.

I must therefore respectfully dissent.