**FOX BAY PARTNERS, Plaintiff,**

v.

**UNITED STATES CORPS OF ENGINEERS, Jess J. Franco, John Rogner and Constance E. Hunt, Defendants.**

**No. 90 C 1755.**

United States District Court,
N.D. Illinois, E.D.

July 30, 1993.

Dennis Eric Carlson, Chicago, IL, for plaintiff.

Ann L. Wallace, U.S. Attorney's Office, Chicago, IL, Daniel S. Goodman, U.S. Dept. of Environment & Natural Resources, Washington, DC, for defendants.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court are the parties' cross motions for summary judgment. For the following reasons, defendants' motion for summary judgment is granted and plaintiff Fox Bay Partners' ("Fox Bay") motion for summary judgment is denied.

---

1. The term "Corps" is occasionally used in this opinion to refer to all the defendants in the case, including the individual defendants, all of whom were Corps employees at the time of the denial of Fox Bay's permit application.

### FACTS

Fox Bay seeks judicial review of a final decision of the Chicago District of the United States Army Corps of Engineers ("Corps")[1] denying Fox Bay's application of a permit to construct a 512–slip private recreational for-profit commercial marina on the Fox River, near the City of McHenry, Illinois. As part of the business venture, the marina was to include a yacht club, a health club, a restaurant, and a parking facility. The properties adjacent to the marina were to be developed for commercial, retail, single and multi-family residential uses. Further, the development was projected to provide numerous recreational activities, create over 400 jobs, generate over $2 million a year in real estate and sales tax revenues, create 1.43 acres of new wetlands, and expand and improve the City of McHenry's municipal sewer and water system, resulting in improved groundwater and improved river water quality. The marina project, however, would also necessitate the filling of approximately 1.13 acres of wetlands and would involve the construction of piers, boat docks, and boat ramps in navigable waters of the United States, and therefore, Fox Bay was required to obtain a permit from the Corps pursuant to two federal statutes: the Clean Water Act of 1977 ("CWA"), 33 U.S.C. §§ 1251 et seq., and the Rivers and Harbors Appropriation Act of 1899 ("RHA"), 33 U.S.C. §§ 401 et seq. Fox Bay submitted its applications to the Corps on January 27, 1989.

In conjunction with the Illinois Environmental Protection Agency and the Illinois Department of Transportation, the Corps issued a public notice of the proposed project on February 17, 1989. After a lengthy public comment and review process conducted pursuant to regulations promulgated by the Corps and the United States Environmental Protection Agency ("EPA"), the Corps denied Fox Bay's permit application. The Corps found that, although the proposed marina would provide some public benefits, the project on the whole was contrary to the public interest because of the potential long-

term significant degradation of the Fox River and Chain–O–Lakes. The Corps found that "the Fox Bay Marina Project, in combination with marinas, boat launches and private boat docks that have already been permitted and with similar projects that are reasonably foreseeable in the near future, would result in significant, cumulative, adverse impacts." The principal basis for the Corps' decision was the potential increase in the number of large power boats that the marina would introduce to, and the effects these boats would have on, the aquatic ecosystem of the Fox River and Chain–O–Lakes.

Fox Bay filed the instant complaint for declaratory and injunctive relief on March 26, 1990, challenging the Corps' permit denial. According to the complaint, the Corps improperly evaluated Fox Bay's permit application by conducting a broad public interest review of the overall project and considering such factors as oversaturated boating conditions of the Fox River, while allegedly failing to conduct appropriate scientific evaluations of the proposed project. Because of its allegedly improper evaluation, Fox Bay claims the Corps' decision was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and in excess of statutory jurisdiction, authority, and limitations within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(c)." Furthermore, Fox Bay alleges that the Corps failed to give due consideration to Fox Bay's offer to mitigate the adverse effects of the proposed marina, and that the record evidence does not support the Corps' determination that the project would be contrary to the public interest.

### DISCUSSION

Fox Bay's challenge to the Corps' permit denial is governed by the standard of review in the Administrative Procedure Act ("APA"): whether the Corps' action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The critical question raised in Fox Bay's challenge is not whether the court would have granted the permit, but "whether the Corps exceeded the bounds of its decision-making authority...." *River*

*Rd. Alliance, Inc. v. Corps of Engineers of the United States Army,* 764 F.2d 445, 450 (7th Cir.1985), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). The scope of review under the arbitrary and capricious standard is narrow, and the judgment of the court cannot be used as a substitute for that of the Corps. *See St. James Hosp. v. Heckler,* 760 F.2d 1460, 1465 (7th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985). Although deference is accorded to Corps decisions, this deference will not shield the Corps' action "from a thorough, probing, in-depth review." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

In accordance with the arbitrary and capricious standard, the court will uphold actions that are "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Because the CWA and RHA delegated to the Corps the authority to issue permits for the discharge of fill material into, and the creation of obstructions in, navigable waters, *see Buttrey v. United States,* 690 F.2d 1186 (5th Cir.), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), the only inquiry to be made in the instant case is whether the Corps' decision to deny Fox Bay's application was rational and consistent with the statute and applicable guidelines. *See Sullivan v. Everhart,* 494 U.S. 83, 87, 110 S.Ct. 960, 963, 108 L.Ed.2d 72 (1990).

The permit application submitted by Fox Bay was required by § 301(a) of the CWA and § 10 of the RHA. Under § 301(a), the "discharge of any pollutant by any person" into the navigable waters of the United States is prohibited, and under § 10, the creation of any unauthorized "obstruction" in the navigable waters of the United States is prohibited. With regard to both sections, the definition of the terms used therein are vital to comprehend the applicability of these provisions to the instant case.

The CWA defines the phrase "discharge of a pollutant" to include "any addi-

tion of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant," in turn, is defined broadly to include, among other materials, "dredged spoil," "heat," "rock," "sand," and "cellar dirt." 33 U.S.C. 1362(6). The term "navigable waters" is also defined broadly, encompassing wetlands. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3; 40 C.F.R. § 230.3(s); *See United States v. Pozsgai,* 999 F.2d 719 (3d Cir.1993) (discharge of fill material into wetlands constituted the discharge of pollutants into water for CWA purposes); *see also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131–39, 106 S.Ct. 455, 461–65, 88 L.Ed.2d 419 (1985) (holding that the term "navigable" as used in the CWA is of limited import and that "wetlands" adjacent to traditionally navigable bodies of water and their tributaries are subject to the Corps' jurisdiction). Like most of the definitions in the CWA, the term "obstruction," as used in the RHA, is broadly defined. *United States v. Republic Steel Corp.,* 362 U.S. 482, 486–87, 80 S.Ct. 884, 887–88, 4 L.Ed.2d 903 (1960) (holding that industrial deposits created an "obstruction" in the Calumet River). The RHA's reference to "navigable water," however, is limited to tidal waters and to non-tidal waters that "are presently used, or have been used in the past, or may be susceptible for use" in navigation. 33 C.F.R. § 329.4. Pursuant to these defined terms, Fox Bay's proposed filling of wetlands constitutes the discharge of a pollutant into navigable waters of the United States for purposes of the CWA, and the construction of docks, piers, and boat ramps creates obstructions in the navigable waters of the United States for purposes of the RHA. Therefore, Fox Bay was required to obtain a permit before engaging in any of these activities, and the Corps, having received Fox Bay's permit, consolidated the permit proceedings under both statutes.

Consideration of CWA § 404 permit applications and RHA § 10 permit applications is governed by regulations promulgated by the Corps and codified at 33 C.F.R. §§ 320–329. As set forth in 33 C.F.R. § 320.1(a)(1), the Corps is required to consider "the full public interest" by balancing the favorable impacts of a proposed project against its detrimental

impacts. Under § 320.4(a), the Corps undertakes a "public interest review" of all permit applications, evaluating "the probable impacts, including cumulative impacts, or the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). The Corps must balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.-4(a)(1). Subject to the EPA's guidelines and other applicable criteria, the Corps will grant permit applications "unless the district engineer determines that [to do so] would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

The EPA's guidelines for the issuance of CWA § 404 discharge permits are published at 40 C.F.R. § 230. Despite their title, the § 404 guidelines are binding legislative rules. 45 Fed.Reg. 85,336 (Dec. 24, 1980). Unlike the Corps' public interest review, the § 404 guidelines are applicable only to CWA § 404 permit applications, not to RHA § 10 permit applications. The purpose of the § 404 guidelines is to "restore and maintain the chemical, physical, and biological integrity of the waters of the United States through the control of discharges of dredged or fill material." 40 C.F.R. § 230.1(a); *See also* 33 U.S.C. § 1251(a). Accordingly, the Corps will deny a permit application if the discharges would not comply with the § 404 guidelines, 33 C.F.R. § 320.4(a)(1), regardless of the outcome of the public interest review. *See Friends of Earth v. Hintz,* 800 F.2d 822, 830 (9th Cir.1986).

■ In considering Fox Bay's permit application, the Corps engaged both a public interest review and a § 404 guidelines review. The Corps' review of the application considered the broad range of positive effects which the proposed marina could produce. Ultimately, however, the Corps focused on two specific reasons for denying the application: the proposed discharges would "contribute to significant degradation of the aquatic ecosystem," and the proposed project would "contribute to severe overcrowding of recreational boats on the Fox River and Chain–O–Lakes." Fox Bay challenges these findings as being insufficiently connected to

Fox Bay's proposed "discharge" of dredged material, alleging that the Corps is attempting to regulate an activity—boating and recreational water use—that is not within its regulatory jurisdiction. Specifically, Fox Bay claims that the Corps went beyond its authority and violated the CWA by denying the permit application based on the consequences of the entire marina project, rather than the immediate effects of the proposed discharge of dredged or fill material.

Under the § 404 guidelines, "no discharge of dredged or fill material shall be permitted which will cause *or contribute* to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c) (emphasis added). Moreover, under § 230.10(c) of the guidelines, the Corps must consider indirect effects of a discharge: "findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests...." 40 C.F.R. § 230.10(c). The reference to "factual determinations" incorporates § 230.11 of the § 404 guidelines:

§ 230.11   Factual determinations

\* \* \* \* \* \*

(h) *Determination of secondary effects on the aquatic ecosystem.* (1) Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material.

40 C.F.R. § 230.11. Therefore, the Corps must look not only at the direct effects of a discharge but also at the indirect effects.

No one claims that the proposed fill or construction itself will cause a significant degradation of the waters of the Fox River and Chain-O-Lakes; however, the fill and construction that the Corps has been asked to authorize will lead to the existence of 512 new boat slips, which in turn will contribute to the already ·oversaturated boating conditions on the river, which will consequently increase the resuspension of river bed sediments and will further the congestion of the river's traffic conditions. This conclusion is supported by the Corps' evaluation of the proposed Fox Bay project, which includes a broad range of topics that verify the reasons for the permit denial. Among the environmental and public interest factors that the Corps analyzed were the following: (1) the purpose and need for the marina project; (2) various alternatives to the project, including no action, different project designs, and alternative sites; (3) anticipated physical and chemical changes that would flow from the project, including substrate impacts, changes in water currents, water quality impacts, suspension of particulate matter and turbidity, flood control functions, and erosion and accretion patterns; (4) anticipated biological changes, including effects on the habitats of fish and other aquatic organisms, habitat diversity and interspersion, impacts on wildlife ranging from insects to migratory waterfowl and small mammals, biological productivity, and threatened and endangered species; (5) human use impacts, including recreational fishing, recreational boating, aesthetic values, and the use of state parks; (6) anticipated social effects of the project in such areas as traffic and transportation, public health and safety, air quality, noise, historic preservation, land use classification, private property rights, and public facilities; and (7) economic impacts, including property values, taxes, regional growth, employment, commercial retail activity, farm production, commercial navigation, commercial fishing, energy consumption, and mineral needs.

In analyzing these various factors, the Corps determined that the proposed project would have some beneficial effects, including the connection of hundreds of existing homes to a new sanitary sewer system, the encouragement of marina members to engage in fitness activities, and the creation of a few hundred long and short term jobs. These positive factors, however, were insufficient to outweigh the negative effects of the Fox Bay project. The Corps focused on the physical, chemical, and biological changes that would result from the "significant, long-term, cumulative increase in suspended sediments" associated with the addition of numerous motor boats to the Fox River. These conclusions were supported by the Corps' cumulative impacts assessment, which found that the proposed discharges would contribute to the

significant degradation of the aquatic ecosystem and the waters of the United States.

The Corps also supported its denial of the permit application with the finding that "the proposed project would contribute to severe overcrowding of recreational boats on the Fox River and Chain–O–Lakes...." The Corps bolstered this finding with numerous public comments suggesting that the Fox River was already dangerously crowded with power boats. Furthermore, the Corps' noted that even if Fox Bay eliminated two existing boat launch ramps, as planned, this would not eliminate the project's potential contribution to the oversaturated boating conditions and the resulting environmental impacts to the Fox River and Chain–O–Lakes. *See Norfolk v. United States Army Corps of Engineers,* 968 F.2d 1438, 1449 (1st Cir.1992) (basic proposition of CWA law is that if mitigation measures are insufficient the permit should be denied).

Given the marina project's expected adverse effects on the physical and biological integrity of the Fox River, the potential worsening of already oversaturated boating conditions on the river, and the substantial public opposition to the proposal, the Corps rationally concluded that the project was contrary to the public interest. In reaching this decision, the Corps "followed required procedures, evaluated relevant factors and reached a reasoned decision." *Van Abbema v. Fornell,* 807 F.2d 633, 636 (7th Cir.1986). The Corps applied the correct legal analysis under the CWA and the RHA and amply supported its decision to deny the Fox Bay permit application with an impressive array of factual findings. Because the Corps had a rational basis for its permit decision, the defendants are entitled to summary judgment as a matter of law.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and accordingly, plaintiff's motion for summary judgment is denied.

IT IS SO ORDERED.