**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-14171
Non-Argument Calendar

————————————————

CENTER FOR A SUSTAINABLE COAST,
KAREN GRAINEY,

                                               *Plaintiffs-Appellants,*

*versus*

U.S. ARMY CORPS OF ENGINEERS,
DISTRICT COMMANDER AND DISTRICT ENGINEER,

                                               *Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:19-cv-00058-LGW-BWC

————————————————

Before NEWSOM, GRANT, and WILSON, Circuit Judges.

PER CURIAM:

This "classic procedural rights case" is back on appeal—this time on the merits. *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1353 (11th Cir. 2024). Because the decision of the U.S. Army Corps of Engineers was not arbitrary and capricious, we affirm.

## I.

Lumar LLC sought to build a 500-square-foot private dock on the Fancy Bluff Creek, adjacent to its 82-acre property on the Cumberland Island. This project implicates at least four federal statutes: the Rivers and Harbors Act, the National Environmental Policy Act (NEPA), the Cumberland Island National Seashore Act, and the Administrative Procedure Act (APA).

The Rivers and Harbors Act of 1899 blocks the construction of certain structures in the navigable waters of the United States unless the plan is first "recommended by the Chief of Engineers." 33 U.S.C. § 403. Because this statute covers the coastal waters along Cumberland Island's shoreline, Lumar asked the Corps to issue a permit so that the dock project could get underway. As part of its application, Lumar submitted a tall stack of maps, photos, blueprints, reports, surveys, and paperwork.

NEPA requires an agency to prepare an environmental impact statement before undertaking, funding, or approving a "major" project "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). But under then-existing regulations, the Corps may forgo an environmental impact statement by invoking a categorical exclusion. 33 C.F.R. § 325 app.

B at 6a (1988).[1]  Relevant here, the Corps can issue a "letter of permission" for some Rivers and Harbors Act applications if "in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition." *Id.* § 325.2(e)(1)(i).

The Corps issued a letter of permission for Lumar's dock, concluding that the project would have no more than negligible effects on the area's air, water, land, wildlife, and aesthetics.  It also consulted four other agencies, including the U.S. Fish and Wildlife Service, National Marine Fisheries Service, National Park Service, and Georgia Department of Natural Resources.  None objected to the project.  The Corps therefore concluded that the "project is minor in nature, will not have significant impact on environmental values, and should encounter no opposition."

The Center for a Sustainable Coast perceives a critical error.  The Cumberland Island National Seashore Act designates the island as a national seashore, to be "permanently preserved in its primitive state."  16 U.S.C. § 459i-5(b).  The Center believes that

---

[1] This regulation has since been rescinded.  *See* Procedures for Implementing NEPA; Processing of Department of the Army Permits, 90 Fed. Reg. 29465 (July 3, 2025) (to be codified at 33 C.F.R. pts. 320, 325, 333).  Because the parties agree that the challenged agency action must be assessed according to the regulations in effect at the time, we proceed under that assumption.  *See, e.g.*, *Bair v. California Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).  In any event, the new regulations include the same categorical exclusion that the Corps invoked for Lumar's dock project.  *See* 33 C.F.R. § 333.14(g)(1)(v) (2025).

the dock would violate the island's protected status.  So it filed this lawsuit, claiming that the Corps's letter of permission violated the Seashore Act and its failure to prepare an environmental impact statement violated NEPA and the APA.

The district court granted summary judgment for the Corps on standing grounds.  We reversed on the NEPA claim.  *See Ctr. for a Sustainable Coast*, 100 F.4th at 1359.  And though the Center had abandoned its Seashore Act claim on appeal, we explained that it could still argue that "the Seashore Act is one reason that issuing a letter of permission rather than completing a NEPA review was arbitrary and capricious."  *Id.*

On remand, the district court granted summary judgment for the Corps, concluding that its issuance of a letter of permission was not arbitrary and capricious.  The Center appeals again.

## II.

We review de novo a district court's grant of summary judgment.  *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019).

An agency's decision to forgo an environmental impact statement "can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (quoting 5 U.S.C. § 706(2)(A)).

To survive arbitrary-and-capricious review, the agency action must "be reasonable and reasonably explained."  *FCC v.*

*Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  This standard is "exceedingly deferential": we "may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021) (quotation omitted); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (quotation omitted).  At the same time, this standard is not "toothless." *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring).  The agency must still offer "a satisfactory explanation for its action," and "cannot simply ignore an important aspect of the problem." *Ohio v. EPA*, 603 U.S. 279, 292–93 (2024) (quotation omitted).

### III.

We now consider the Corps's conclusion that Lumar's dock project would (1) be "minor in nature," (2) "not have significant impact on environmental values," and (3) "encounter no opposition."  The Center insists that the Corps missed the mark on all three criteria.  We disagree.

*First*, the Corps reasonably concluded that the project was "minor" based on the dock's size, scale, and other attributes.  The Corps issued a permit for Lumar to construct a 10- by 50-feet dock.  Extending 50 feet into the water, this dock would leave about 3,070 feet of unobstructed waterways at normal tide.  Facing inland, the dock would connect to a 4- by 26-feet ramp, which would lead to a 14- by 20-feet deck, and then a narrow 200- by 6-feet walkway.  And this single-family recreational dock was not designed to

accommodate "larger boats and barges," but to allow smaller boats to reach Lumar's island property from the mainland. Nor would the dock appear out of place: it would share a "similar layout and style" as "numerous" others in the area, including a National Park Service ferry dock located about 1,000 feet away. The Corps was therefore within bounds to characterize the project as "minor."

*Second*, the Corps reasonably concluded that the dock project would not pose a "significant impact on environmental values." The Corps evaluated how the project scored on over two dozen criteria: soil and water supply conservation, water and air quality, noise levels, flood hazards, shoreline erosion, shellfish production, wildlife conservation, mineral resources, and more. The Corps concluded that the project would have no more than negligible adverse effects in each category. Specifically, construction would entail little to no disruption because it would take less than a year to complete, and involve no fill material, dredging, or excavation. And on the off chance that construction might affect endangered West Indian manatees in the area, the permit required Lumar to undertake certain precautions to protect them. Once finished, the dock would lead to "very little to no increase in boat traffic" in the area. The Corps also required Lumar to hire an archaeologist to assess whether the dock would jeopardize any archaeological sites and historical districts over a 7.3-acre tract—even in places far from the construction site. Reviewing the expert report, neither the Corps nor the Historic Preservation Division of the Georgia Department of Natural Resources saw any red flags.

24-14171                 Opinion of the Court                        7

The parties agree that as part of its analysis, the Corps must also consider the aesthetic value of preserving the seashore "in its primitive state."[2]  16 U.S.C. § 459i-5(b).  The dispute is over whether the letter of permission said enough about the matter.  The Corps did not mince words:

> The proposal would result in the construction of a proposed dock facility in Fancy Bluff Creek. Presently, numerous docks of similar layout and style exist.  Therefore, the Corps has determined that the proposed work would have a negligible effect on aesthetic values within the project area.

This explanation was enough.  "Documentation of reliance on a categorical exclusion need not be detailed or lengthy"; it need only indicate "that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did." *Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004).  The Center does not challenge the Corps's factual finding that Lumar's proposed dock is styled like many others in the area.  Based on that finding, the Corps reasonably concluded

---

[2] The parties do not ask us to decide whether bare aesthetic harms can significantly affect "the quality of the human environment" for purposes of NEPA. 42 U.S.C. § 4332(C); *see River Rd. All., Inc., v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985) ("Aesthetic objections alone will rarely compel the preparation of an environmental impact statement.  Aesthetic values do not lend themselves to measurement or elaborate analysis.").  We leave that question for another day.

that the project would not significantly impact the seashore's aesthetics.

*Third*, in light of its assessment that the dock project would be "minor in nature" and pose no "significant impact on environmental values," the Corps reasonably predicted that the project would face no appreciable opposition.  Of course, the public has a strong interest in Cumberland Island's "pristine maritime forests, undeveloped beaches and wide marshes."[3]  And though the Corps did not expressly mention the Seashore Act, implicit in its request for Lumar to obtain permission from the National Park Service is a recognition of Cumberland Island's protected status.  As the island's custodian, the National Park Service interacts with countless tourists, sightseers, and other members of the public on a regular basis—and its park rangers share the public's fondness for the island's natural beauty and quiet. Given that the National Park Service lodged no objection to Lumar's project, the Corps reasonably determined that public outcry would be unlikely.  In hindsight, the Corps may have misjudged.  Still, its "reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001) (quotation omitted).

None of the Center's counterarguments are persuasive.  To begin with, the Center points out that the letter of permission did

---

[3] *Where Nature and History Meet*, Nat'l Park Serv. (July 30, 2024), https://www.nps.gov/cuis/index.htm.

not use the word "primitive" anywhere.  No doubt, aesthetics and primitiveness are distinct concepts.  But it's clear from context that the Corps's assessment of the project's aesthetic effects was an assessment of whether and how it would affect the seashore's natural scenery.  And to the extent Cumberland Island's protected status creates "extraordinary circumstances where normally excluded actions could have substantial environmental effects," the Corps was "alert" to those circumstances.  33 C.F.R. § 325 app. B at 6b.

Next, the Center faults the Corps for failing to consider whether the dock would snowball into other, larger-scale projects. Lumar's application stated that if the dock project got off the ground, Lumar would plan "to construct a single family residential structure in the future."  But the Corps need not evaluate the environmental effects of "other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. ----, 145 S. Ct. 1497, 1515 (2025).

The Center also contends that dock projects may be excluded from NEPA only if they involve small docks.  In addition to "[a]ll applications which qualify as letters of permission," the regulation at issue extends exclusions for small piers and docks, minor utility lines and dredging, and boat launching ramps.  33 C.F.R. § 325 app. B at 6a.  Relying on the *ejusdem generis* canon, the Center reads the regulation's reference to "small docks" to mean

that letters of permission cannot extend to large dock projects. We read the regulation differently. Even assuming for argument's sake that Lumar's project did not involve a "small dock," it still fell within the plain language of the letters-of-permission catchall exclusion. *Ejusdem generis* "instructs courts to interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (alteration adopted and quotation omitted). Here, the letters-of-permission catchall exclusion is "controlled and defined by reference to" the specific exclusions that precede it. *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quotation omitted). The entire list shares a theme: each exclusion involves projects with negligible effects on "the quality of the human environment," thus falling outside NEPA. 42 U.S.C. § 4332(C). That theme is already baked into the catchall term: the Corps may issue a letter of permission only if the project would be "minor," entail no "significant individual or cumulative impacts on environmental values," and engender "no appreciable opposition." 33 C.F.R. § 325.2(e)(1)(i). So the plain reading of the catchall exclusion comports with *ejusdem generis*.

Last, the Center argues that the Corps cannot issue letters of permission for private projects that are larger in magnitude than the types of civil works projects that Corps regulations exclude from NEPA. This argument hinges on the Corps's statement during notice and comment rulemaking: "in general, the categorical exclusions for Corps activities and private permit applicants should be of the same general magnitude."

Environmental Quality; Procedures for Implementing the National Environmental Policy Act, 53 Fed. Reg. 3120, 3126 (Feb. 3, 1988) (to be codified at 33 C.F.R. pts. 230, 325). Other than point to the dock's square footage, however, the Center offers nothing to suggest that the dock project's effects on the "quality of the human environment" are an order of magnitude higher than those of excluded Corps activities. *See* 42 U.S.C. § 4332(C); 33 C.F.R. §§ 230.9, 325 app. B at 6a.

## IV.

Separately, the Center objects to the district court's decision not to consider the National Park Service's 1994 Land Protection Plan for the Cumberland Island National Seashore, which sought "to identify land protection alternatives to assure the protection of the natural, historic, scenic, cultural, recreational or other significant resources." Even assuming—again, for argument's sake—that this extra-record document may be considered, and that it set out land use controls for the island, it does not help the Center's case.

The Center relies on a regulation that instructs the Corps to decide permit applications in a manner that, "insofar as possible," is "consistent with, and avoid[s] significant adverse effects" on the "historic, cultural, scenic, conservation, recreational or similar values" underlying applicable federal, state, regional, or local land use controls. 33 C.F.R. § 320.4(e). But as we have explained, the Corps did, in fact, consider the dock project's effects on these values, and reasonably concluded that it would have no more than

negligible consequences and thus "would have no effect on land use within the vicinity of the project." Importantly, the National Park Service—well aware of its own land use controls—did not object. To the extent inland construction of a residential home would be inconsistent with federal land use classifications, the Corps need not consider how those classifications might apply to "a possible future project." *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1515.

★    ★    ★

"The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* Here, the Corps "reasonably considered the relevant issues and reasonably explained" its decision. *Prometheus Radio Project*, 592 U.S. at 423. So the inquiry is at an end. We **AFFIRM**.